# IN THE SUPREME COURT OF CALIFORNIA

MATTHEW BOERMEESTER,
Plaintiff and Appellant,

v.

AINSLEY CARRY et al.,
Defendants and Respondents.

S263180

Second Appellate District, Division Two
B290675

Los Angeles County Superior Court
BS170473

---

July 31, 2023

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

---

BOERMEESTER v. CARRY

S263180


Opinion of the Court by Groban, J.


In recent years, courts in California and throughout the nation, as well as the California Legislature and the United States Department of Education's Office for Civil Rights (OCR), have attempted to determine the precise procedures universities[1] must utilize when investigating and disciplining students accused of sexual misconduct or intimate partner violence. This judicial and legislative activity likely began in response to a "Dear Colleague" letter relating to title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (Title IX) that the OCR issued in 2011, which gave guidance on the specific procedures federally funded universities should implement when investigating sexual harassment allegations. The letter sought to stymie the rising tide of sexual assault on campuses by making it easier for victims to prove their claims in university disciplinary actions. Though the letter was rescinded in 2017, students accused of sexual misconduct or intimate partner violence continue to challenge many of the disciplinary procedures universities have since implemented, asserting that these procedures create an unfair process which may result in universities mistakenly imposing severe sanctions upon accused students, including expulsion.

---

[1]     In this opinion, we use the term "universities" to refer to all postsecondary educational institutions.

In this case, respondents University of Southern California and its Vice President of Student Affairs, Ainsley Carry (collectively, USC) expelled appellant Matthew Boermeester from the private university after conducting a two-month investigation and determining that he violated USC's policy against engaging in intimate partner violence. Boermeester filed a petition for a writ of administrative mandate under Code of Civil Procedure section 1094.5 (section 1094.5), alleging that he was deprived of the "fair trial" required by that section. A divided Court of Appeal agreed, with the majority concluding that "USC's disciplinary procedures . . . were unfair because they denied Boermeester a meaningful opportunity to cross-examine critical witnesses at an in-person hearing." (*Boermeester v. Carry* (June 4, 2020, B290675) review granted and opn. ordered nonpub. Sept. 16, 2020, S263180.) More specifically, the Court of Appeal majority determined that USC's disciplinary procedures were unfair because USC should have afforded Boermeester the opportunity to attend a live hearing at which he or his advisor-attorney would directly cross-examine the alleged victim, Jane Roe,[2] as well as the third party witnesses, or indirectly cross-examine them by submitting questions for USC's adjudicators to ask them at the live hearing. (*Boermeester v. Carry, supra*, B290675.) The Court of Appeal majority made clear that the witnesses need not be "physically present to allow the accused student to confront them" and could instead appear "by videoconference, or by another method that would facilitate the assessment of credibility." (*Ibid.*)

---

[2] Like the Court of Appeal, we refer to Roe and the other witnesses in a manner that protects their privacy. (Cal. Rules of Court, rule 8.90.)

Nevertheless, the Court of Appeal majority believed that accused students must be able to contemporaneously hear and observe the real-time testimony of the accuser and other witnesses at a live hearing to have a "meaningful opportunity to respond to the evidence against [them]" and ask follow-up questions. (*Ibid.*)

We hold that, though private universities are required to comply with the common law doctrine of fair procedure by providing accused students with notice of the charges and a meaningful opportunity to be heard, they are not required to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a live hearing with the accused student in attendance, either in person or virtually. Requiring private universities to conduct the sort of hearing the Court of Appeal majority envisioned would be contrary to our long-standing fair procedure admonition that courts should not attempt to fix any rigid procedures that private organizations must "invariably" adopt. (*Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 (*Pinsker II*).) Instead, private organizations should "retain the initial and primary responsibility for devising a method" to ensure adequate notice and a meaningful opportunity to be heard. (*Ibid.*) We accordingly reverse the Court of Appeal's judgment.

## I. BACKGROUND

This matter comes to us on appeal from a judgment on a petition for a writ of administrative mandate made pursuant to section 1094.5. Our recitation of the facts is accordingly derived solely from the administrative record. (*Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 864; accord, *Pomona Valley*

*Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101.)

### A. USC's Policies

The USC student conduct code in effect at the time of the incident in question prohibited students from engaging in intimate partner violence, which it defined as "violence committed against a person . . . with whom [the accused student has] had a previous or current dating, romantic, intimate, or sexual relationship." Violence, in turn, was defined as "causing physical harm to the person." Upon receiving a report of intimate partner violence or other prohibited conduct, USC's Title IX office would conduct an intake interview of the accuser or alleged victim.[3] If USC decided to open a formal investigation, it would notify the accuser and the accused student of the investigation and the alleged policy violations. USC would also assign a Title IX investigator to the matter, who would gather facts and interview witnesses. Upon completion of the investigation, USC would provide the accuser and the accused student "individual and separate" opportunities to review the gathered evidence. After reviewing the evidence, the accuser and the accused student would be given "individual and separate" opportunities to respond to the evidence through an "evidence hearing" held at the Title IX office and conducted by

---

[3] All universities that receive federal financial assistance must designate at least one employee, referred to as the Title IX coordinator, as being responsible for ensuring compliance with Title IX. (34 C.F.R. § 106.8(a) (2023).) At the time of the incident in question, USC had a Title IX office consisting of a Title IX coordinator, who oversaw the office, and Title IX investigators, who investigated specific allegations of misconduct.

USC's Title IX coordinator. USC would also provide the accuser and the accused student the opportunity to submit questions for the Title IX coordinator to ask one another at their separate hearings. If either student shared new information during their separate hearing, USC would provide the other student an opportunity to review and respond to the new evidence.

At the conclusion of the evidence hearings, the Title IX investigator would prepare a summary administrative review (SAR) which, using a preponderance of the evidence standard, would make factual findings and conclusions as to whether the accused student violated one or more of USC's policies. If the SAR found that a policy was violated, the SAR would be forwarded to a misconduct sanctioning panel, composed of one undergraduate student and two staff designated by the provost and senior vice president for academic affairs, to impose sanctions. Either the accuser or the accused student could file a written appeal. The appeal would be reviewed by an appellate panel composed of three individuals appointed by the vice president for student affairs. The vice president of student affairs had the discretion to accept or reject the appellate panel's recommendations and made the final decision. Throughout the process — from investigation to final adjudication — both the accuser and accused student were allowed to receive support and assistance from an advisor of their choice, who could be an attorney.

### B. The Incident

Boermeester and Roe were students at USC who had an " 'on and off' " romantic relationship from approximately March 2016 to October 2016. Although they were no longer in a relationship by January 21, 2017 — the date the incident

occurred — the two often spent time together and Boermeester regularly stayed the night at Roe's apartment.

USC's Title IX office received a report of an incident that took place on January 21, 2017. The office assigned a Title IX investigator to investigate the incident, who interviewed Roe two days later. Roe explained that, on the night of the incident, Boermeester called her and asked her to pick him up from a party. He was the " 'drunkest' " she had ever seen him. Roe had her dog with her, and when they arrived at Roe's apartment and exited the car, Boermeester instructed Roe to drop her dog's leash. She did not want to do so, so he grabbed the back of her hair " 'hard' " and said " 'drop the fucking leash.' " Roe said " 'No' " and Boermeester grabbed her harder, causing her to drop the leash because it " 'hurt.' " Boermeester then grabbed the front of Roe's throat and neck, causing her to cough. She was able to breathe but stated that the pressure " 'hurt.' " Boermeester laughed and let go of her neck, but then grabbed her by the neck again and pushed her " 'hard,' " forcing her head against the concrete wall along the alley behind her apartment duplex. Boermeester again let her go, but then grabbed her neck once more and again hit her head against the wall. Roe's head hurt from the impact.

Roe also provided the Title IX investigator with a detailed account of prior instances of physical violence perpetrated by Boermeester. She described Boermeester as being " 'mean' " and " 'always putting [her] down,' " and she read a list of demeaning things he had said to her within a 24-hour period, which she had catalogued on her phone. Roe requested an avoidance of contact order prohibiting Boermeester from contacting her and requested temporary emergency housing.

There were two eyewitnesses to the incident. A student, D.H., reported to the Title IX investigator that sometime after midnight on January 21, 2017, he heard a male yelling loudly in the alley next to the apartment duplex D.H. shared with Roe. D.H. looked out the window and saw Boermeester pinning Roe against a wall with his hand around her neck. He also saw Roe's dog running up and down the street, which D.H. perceived as a problem because Roe never allowed her dog to run freely. He awakened his roommate, T.S., who did not see the incident but accompanied D.H. outside. D.H. and T.S. escorted Roe back to their apartment. D.H. reported that Roe seemed " 'pretty scared' " but she refused to sleep at their apartment because she did not want to make Boermeester " 'more mad.' " Roe told the investigator that she refused to spend the night at D.H.'s and T.S.'s apartment because Boermeester " 'wouldn't understand,' " and so she returned to her own apartment to avoid " 'mak[ing] it worse.' " Later the same day, D.H. reported the incident to the men's tennis coach, who in turn reported it to the Title IX office.

A second eyewitness, M.B.2, was interviewed twice. Initially, he told the Title IX investigator that he saw Roe arguing with a male he did not recognize but did not see any physical contact between the two. Later, however, he called the Title IX investigator to report that he " 'saw everything' " and wished to speak with the investigator again. During the second interview, M.B.2 explained that he " 'tried to downplay' the incident" in his initial interview both because he believed Roe was scared of Boermeester and because Roe had asked M.B.2 to " 'keep it on the down low.' " M.B.2 reported during his second interview that he, like D.H., heard screaming in the alley near his residence on the night in question. He looked out the window

and saw Boermeester standing in front of Roe with both hands around her neck. Boermeester pushed Roe into the alley wall and Roe made " 'gagging' " sounds. Based on his observations, M.B.2 stated that Boermeester " 'is violent' " and " 'domestically was abusing [Roe].' " M.B.2 grabbed a trash bag, went outside, and asked Roe and Boermeester how things were going, which " 'broke it up.' "

In his own interview with the Title IX investigator, Boermeester admitted that he had instructed Roe to release her dog, and then put his hand around her neck while she was against the alleyway wall. But he insisted that the act amounted to playful " 'horsing around' " or sexual foreplay — not intimate partner violence.

USC's Title IX office obtained surveillance video of the incident. As the Court of Appeal majority observed, the video is "grainy and there is no audio"; Boermeester and Roe "are small figures in the frame of the video" since the camera "is positioned approximately two buildings away from [them]"; and "the interaction between Boermeester and Roe when they are near the wall [is] barely visible." (*Boermeester v. Carry*, *supra*, B290675.) Nevertheless, the following events can be seen, as described by both the superior court and the Court of Appeal majority: " 'At 12:16:16 a.m., the video shows [Boermeester] shoving Roe from the area adjacent to the house into the alleyway. At 12:16:50, [Boermeester] appears to be holding Roe's neck or upper body area. At 12:17:12, [Boermeester] grabs Roe by the neck and pushes her toward the wall of the alley. At 12:17:13 and 12:17:14, Roe's head and body arch backwards. Between 12:17:16 and 12:17:26, [Boermeester] and Roe are against the wall and barely visible from the camera. At 12:17:26, [Boermeester] backs away from the wall and re-enters

the camera's view.  At 12:17:28, Roe re-enters the camera's view.  Roe and [Boermeester] proceed to push each other.  At 12:17:38, [Boermeester] moves toward Roe and appears to be pushing her against the wall.  At 12:17:40, a dog can be seen running across the alley.  At 12:17:57, a third party enters the camera's view and walks in the direction of [Boermeester] and Roe.  At that moment, [Boermeester] and Roe walk away from the wall and back towards the house.  At 12:18:19, the third party walks over to the dumpster, places a trash bag inside, and walks back toward the house.' " (*Ibid.*)

Over the course of USC's investigation, the Title IX investigator interviewed both parties (as noted) and 16 additional witnesses (including D.H., T.S., and M.B.2), and also gathered documentary evidence including the video and text messages.  Roe did not want to participate in the investigation and discouraged other witnesses from testifying against Boermeester.  Two days after her initial interview, she told the Title IX investigator she was " 'freaked out' " that Boermeester would learn of the investigation and she feared retaliation from USC's football team (Boermeester was a member of the team).  The next day, she reiterated that she was "freaked out" and stressed that Boermeester "can't know I made a statement" and "can't know I met with you guys."  After Boermeester was given notice of the investigation, Roe stated that she no longer " 'fully believe[d]' " the statements she made during her initial interview and asked if she could withdraw her statement and the avoidance of contact order, explaining she did not want Boermeester to be " 'mad' " at her and she did not " 'trust' " that it would be clearly conveyed to Boermeester that the investigation was initiated by the Title IX office.  Roe also expressed concern that Boermeester would be punished too

harshly. After the investigation was reported in the media, Roe published a tweet on Twitter stating that "I am the one involved in the investigation with Matt Boermeester. The report is false."

At the conclusion of the investigation, Boermeester and Roe separately reviewed the evidence with their advisor-attorneys at the Title IX office. The parties declined to attend their separate hearings or to submit questions for USC's Title IX coordinator to ask one another during their hearings. Instead, they opted to submit separate written statements responding to the evidence. In her written statement, Roe recanted her initial statement and claimed the Title IX office manipulated her into saying exaggerated or untrue things about Boermeester and their relationship. Specifically, Roe explained that she believed her initial discussion with the Title IX office was a "counseling session where [she] was free to vent about [her] relationship or blow off steam," but she later felt that the office was "trying to get [her] to say bad things about [Boermeester] so that they could use those things against him." She further claimed that, had she understood the true nature of the meeting, she "would not have said many of the things [she] said and [she] would have made a greater effort to be accurate." Finally, she emphasized that Boermeester never "hit, choked, kicked, pushed or otherwise physically abused" her. (Boldface omitted.)

The Title IX investigator issued an SAR concluding that Boermeester violated USC's student conduct code by (1) engaging in intimate partner violence and (2) violating the interim avoidance of contact order. The SAR was forwarded to a misconduct sanctioning panel, which recommended expulsion. Boermeester appealed to an appellate panel, which agreed that Boermeester physically harmed Roe — and thus engaged in

intimate partner violence — but was "less certain as to whether [Boermeester] *intentionally* physically harmed [Roe]." The appellate panel acknowledged that intent "is not a required element" for proving intimate partner violence as defined by USC's policy, but nevertheless felt that intent was relevant for sanctioning purposes and accordingly recommended reducing the sanction to a two-year suspension and completion of a 52-week intimate partner violence program. The Vice President of Student Affairs, respondent Carry, rejected the appellate panel's recommendation to reduce the sanction of expulsion. She explained that, whether Boermeester intended to cause Roe physical harm or did so recklessly, expulsion was appropriate given the nature of the harm inflicted.

Boermeester filed a section 1094.5 petition for writ of administrative mandate, which the superior court denied. A divided Court of Appeal reversed, with the majority concluding that USC's disciplinary procedures were unfair because Boermeester was unable to directly or indirectly question Roe and the third party witnesses in real time at a live hearing. (*Boermeester v. Carry, supra*, B290675.) The Court of Appeal majority declined to reach Boermeester's other claims regarding fairness, including his assertion that USC's disciplinary procedures were unfair because USC's Title IX investigator held the dual roles of investigator and adjudicator. (*Ibid.*) We granted review to determine whether the Court of Appeal majority was correct in concluding that USC should have held a live hearing featuring real-time direct or indirect cross-examination of all parties and witnesses (whether conducted in-

person or virtually) with an opportunity for Boermeester to ask the witnesses follow-up questions.[4]

## II. Discussion

### A. Writ of Administrative Review

A writ of administrative review brought pursuant to section 1094.5 allows for judicial review of quasi-judicial decisions that are made "as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (§ 1094.5, subd. (a).) Judicial review is limited to "whether the respondent

---

[4]     The Court of Appeal was split as to whether Boermeester forfeited his right to challenge USC's failure to provide him with a live hearing featuring direct or indirect cross-examination of Roe and the other witnesses. Justice Wiley emphasized in his dissent that Boermeester did not submit cross-examination questions for USC's adjudicators to ask Roe and "*never requested live cross-examination*" of Roe or the other witnesses. (*Boermeester v. Carry, supra*, B290675 (dis. opn. of Wiley, J.).) The Court of Appeal majority declined to find forfeiture, deciding that it would have been futile for Boermeester to request cross-examination at a live hearing since neither USC's policies nor the law at the time allowed for it. (*Boermeester v. Carry, supra*, B290675.)

Neither party asks that we resolve this matter on forfeiture grounds. USC instead urges us to resolve the issue on the merits, noting the need for "clear guidance on what the common law actually requires." We find that the issues raised are important and recurring, and accordingly exercise our discretion to reach the merits without deciding whether Boermeester forfeited his claims. (See *Teacher v. California Western School of Law* (2022) 77 Cal.App.5th 111, 129; *JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 962, fn. 6.)

has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b).) " 'A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law.' " (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*University I*); accord, *Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, 1111.)

Section 1094.5 review applies not only to the decisions of governmental agencies but also to the decisions of private organizations, so long as the private organization was legally required to hold a hearing, take evidence, and make factual determinations in coming to its decision. (*Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 815–817.) We have never previously applied section 1094.5 to a private university's disciplinary decisions. We nevertheless find that section 1094.5 writ review is appropriate because, for the reasons more fully explained below, the common law doctrine of fair procedure applies in this context. Among other things, this doctrine, when applicable, requires a private organization to comply with its own procedural rules governing the expulsion of individuals from the organization, and it permits courts to evaluate the basic fairness of those procedural rules when the organization seeks to exclude or expel an individual from its membership. (*Cason v. Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143 (*Cason*); accord, *Otto v. Tailors' P. & B. Union* (1888) 75 Cal. 308, 314–315.) Here, USC's policies were subject to the common law doctrine of fair procedure, and those policies specified that the university would offer the accused student a hearing, take evidence, and make factual determinations in a

final adjudicatory decision issued by the vice president of student affairs. Thus, the section 1094.5 "elements of hearing, evidence, and discretion in the determination of facts are clearly required by law" and section 1094.5 writ review applies. (*Anton*, at p. 815; see also *Bray v. International Molders & Allied Workers Union* (1984) 155 Cal.App.3d 608, 616 [courts " 'pay proper respect' " to a private organization's " 'quasi-judicial procedure, precluding an aggrieved party from circumventing' " section 1094.5 review].)

The parties do not dispute that section 1094.5 applies. The parties' dispute instead centers on the meaning of a "fair trial" under section 1094.5, subdivision (b). Boermeester asserts that section 1094.5's fair trial component can only be satisfied by adhering to principles established by the common law doctrine of fair procedure which, in certain limited contexts, requires a private organization to give an individual adequate notice of the charges and a reasonable opportunity to respond before expelling the individual from the organization's membership. (*Pinsker II*, *supra*, 12 Cal.3d at p. 555.) Boermeester additionally urges us to rely on constitutional due process principles, though he does not go so far as to suggest that due process applies to private universities like USC. USC, on the other hand, claims that "[s]ection 1094.5 is a procedural vehicle for reviewing public and private administrative decisions" and "does not impose any particular standards of fair procedure." Even so, USC does not dispute that some minimum standard of procedural fairness is required in this context. Moreover, USC relies on cases decided under the common law doctrine of fair procedure in asserting that its disciplinary process was fair.

Neither we nor any other court has held that the fair trial component of section 1094.5 is synonymous with either the common law doctrine of fair procedure or with due process principles, and we decline to do so here. Nevertheless, and as explained more fully below, our fair procedure cases are instructive because the membership-related decisions made by the private organizations in those cases are similar in significant respects to private universities' student disciplinary decisions.

The principles of common law fair procedure are similar to those of constitutional due process in that they are flexible and context specific. Under either concept, the precise procedures necessary to provide a complainant with a meaningful opportunity to be heard "depend[] largely on 'the nature of the tendered issue.' " (*Ezekial v. Winkley* (1977) 20 Cal.3d 267, 279 (*Ezekial*); accord, *Saleeby v. State Bar* (1985) 39 Cal.3d 547, 565.) This is not to say that fair procedure and due process are identical. Due process is a constitutional right designed to protect citizens from abuses of state power, and it does not apply here since no state action is involved. Fair procedure, on the other hand, is a more flexible judicially created concept applicable to private organizations in limited situations. (See *Pinsker II, supra,* 12 Cal.3d at p. 550, fn. 7 [distinguishing due process and fair procedure]; *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 108, quoting Friendly, "*Some Kind of Hearing*" (1975) 123 U. Pa. L.Rev. 1267, 1269–1270, fn. 10 [" 'The precise content of the common law "fair procedure" requirement is far more flexible than that which the Supreme Court has found to be mandated by due process' "].) Because this matter involves a private university, no

constitutional rights are at stake and a greater degree of flexibility is warranted. (See *Pinsker II*, at p. 555.)

With these considerations in mind, we next provide a background on the common law doctrine of fair procedure and discuss how it governs our inquiry.

## B. The Common Law Doctrine of Fair Procedure

The common law doctrine of fair procedure originally developed to prevent the arbitrary expulsion of individuals from memberships in certain private organizations — such as mutual aid societies, fraternities, or unions — where the expulsion "adversely affected [property] rights in specified funds held for the association's members." (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1066 (*Potvin*).) The doctrine was subsequently expanded to prevent the arbitrary expulsion or exclusion of individuals from private organizations that "possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced." (*Ezekial*, *supra*, 20 Cal.3d at p. 272.) For the doctrine to apply, individuals need not show that they would be fully unable to practice their chosen profession absent membership in the organization; they can instead show that "exclusion from membership . . . deprives [them of] substantial . . . educational, financial, and professional advantages." (*Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 164–165, italics omitted (*Pinsker I*).)

In *Pinsker I*, for example, we held that an orthodontics association was subject to the doctrine of fair procedure, explaining that while membership in the association was "not economically necessary in the strict sense of the word," it was a "practical necessity for a dentist who wishes not only to make a

good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty." (*Pinsker I, supra,* 1 Cal.3d at p. 166.)  Similarly, in *Potvin,* we held that an insurer's removal of a physician from its preferred provider list was subject to the doctrine of fair procedure because "the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest."  (*Potvin, supra,* 22 Cal.4th at p. 1071.)  We also elaborated on our rationale for requiring certain private organizations to apply fair procedure in their membership decisions by observing that these organizations "affect[] the public interest" and " 'are viewed by the courts as quasi-public in nature' " which " 'lead courts to impose' " on them certain obligations to the public and the individuals with whom they deal.  (*Id.* at p. 1070.)  This rationale applied to the insurer in *Potvin* since " '[t]he public has a substantial interest in the relationship between [insurers] and their preferred provider physicians.' "  (*Ibid.*)

Most notably, in *Ezekial,* we applied the fair procedure doctrine to prevent an individual's arbitrary expulsion from a residency program at Kaiser, a private teaching hospital. (*Ezekial, supra,* 20 Cal.3d 267.)  We found that the plaintiff was entitled to fair procedure because, by accepting him into its residency program and later seeking to expel him from that program, "Kaiser has assumed the power to permit or prevent [the plaintiff's] practice of a surgical specialty and to thwart the enjoyment of the economic and professional benefits flowing therefrom."  (*Id.* at p. 274.)  We additionally reasoned that "[d]ismissal from Kaiser will, as a practical matter and because

of Kaiser's close relationship with other teaching hospitals, prevent plaintiff's acceptance in any other surgical residency program. Successful completion of an approved surgical residency is a prerequisite to attainment of the status of a 'board certified general surgeon,' without which plaintiff cannot practice a surgical specialty in any accredited California hospital." (*Id.* at pp. 270–271.) Because "the right to practice a lawful trade or profession is sufficiently 'fundamental' to require substantial protection against arbitrary administrative interference," the doctrine of fair procedure applied. (*Id.* at p. 272.)

Unlike in the above cases, this matter does not involve a private entity with "a virtual monopoly" sufficient to impede an individual's pursuit of a particular trade or profession. (*Pinsker I*, *supra*, 1 Cal.3d at p. 166; accord, *Potvin*, *supra*, 22 Cal.4th at p. 1072 [fair procedure applied because "only a handful of health care entities have a virtual monopoly on managed care" and "removing individual physicians from preferred provider networks controlled by these entities could significantly impair those physicians' practice of medicine"].) Nevertheless, a private university provides an important, quasi-public service — a postsecondary education — affecting the public interest. " '[E]ducation is vital and, indeed, basic to civilized society. . . . [I]t is an interest of almost incalculable value, especially to those students who have already enrolled in the institution and begun the pursuit of their college training.' " (*Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 876 (*Goldberg*); accord, *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 399 [expulsion from a university " 'clearly implicates' a protected property interest" and may also involve a protected liberty interest].) Much like in

*Ezekial*, this case involves "an important benefit or privilege," which was already conferred on Boermeester and which USC took away from him by expelling him. (*Ezekial*, *supra*, 20 Cal.3d at p. 273.) Given the seriousness of sexual misconduct or intimate partner violence allegations, a student who is expelled from a university for such conduct may find it especially difficult — if not impossible — to complete a postsecondary education elsewhere, thwarting the student's ability to realize "the economic and professional benefits flowing" from a college degree. (*Id.* at p. 274.)[5] For these reasons, we find that a student's interest in completing a postsecondary education at a private university is analogous to an individual's interest in continuing membership in a private organization that impacts the individual's ability to practice his or her chosen profession. Our common law doctrine of fair procedure therefore applies in determining whether USC's disciplinary procedures were fair.

Where it applies, the common law doctrine of fair procedure requires private organizations to provide adequate

---

[5] USC counters that expulsion will not "tarnish a student's reputation for life" because "federal law prohibits universities from disclosing the findings of investigations into alleged misconduct to unauthorized persons without the consent of the student or, when applicable, his parent." The statute to which USC cites, the Family Educational Rights and Privacy Act of 1974, prohibits the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons. (20 U.S.C. § 1232g(b)(1).) It contains an exception, however, that allows the release of a student's records to other schools at which the student is seeking admission. (20 U.S.C. § 1232g(b)(1)(B).) It therefore does not alter our observation that a student who is expelled from a university for committing sexual misconduct or intimate partner violence may find it difficult to complete his or her education elsewhere.

notice of the charges and a meaningful opportunity to be heard. (*Pinsker II, supra,* 12 Cal.3d at pp. 555–556; *Ezekial, supra,* 20 Cal.3d at p. 278.) We have never held, however, that any specific or baseline procedures must be followed to satisfy these requirements. Boermeester points to *Cason, supra,* 37 Cal.2d 134, where we observed in dicta that a "fair trial" "includes the right . . . to confront and cross-examine the accusers" (*id.* at pp. 143, 144), but we did not hold in *Cason* that the plaintiff was denied a fair procedure on that ground. Instead, we held that the plaintiff was denied a fair procedure because he was not permitted to hear or review the accuser's testimony or to refute that testimony, nor was he allowed to examine the written evidence submitted against him. (*Id.* at pp. 144–145.) Moreover, we have since noted that "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position." (*Pinsker II*, at p. 555.) In fact, we have observed that a formal hearing is not required in all circumstances; at times, it may be sufficient for a private organization to allow only a written response to the charges. (*Ezekial*, at p. 279.) We have further emphasized that, given "the practical limitations on the ability of private institutions to provide for the full airing of disputed factual issues" (*id.* at p. 278), courts "should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the 'charges' against him [or her] and a reasonable opportunity to respond" (*Pinsker II*, at p. 555).

In short, though the fair procedure doctrine requires adequate notice of the charges and a reasonable opportunity to respond, applying the doctrine to this context requires us to give private universities primary responsibility for crafting the precise procedures meant to afford a student with notice and an opportunity to respond. (*Pinsker II, supra,* 12 Cal.3d at p. 555.) Private universities generally know best how to manage their own operations, and requiring a fixed set of procedures they must utilize in every situation when determining student discipline would constitute an improper " 'intrusion into the[ir] internal affairs.' " (*Id.* at p. 557; accord, *Ezekial, supra,* 20 Cal.3d at pp. 278–279.)

## C. Recent Legislation

The Legislature recently enacted legislation setting forth the precise procedures it felt were necessary to ensure fairness to both the accused student and the accuser and to combat sexual violence on university campuses. Senate Bill No. 493 (2019–2020 Reg. Sess.) (Senate Bill 493), which became effective on January 1, 2021 (Stats. 2020, ch. 303), applies to public or private universities that receive state financial assistance and are not exempt from the statute. (Ed. Code, § 66281.8, subd. (a)(1); *id.,* § 66271.) It specifies the procedures universities must implement on and after its effective date to address incidents of sexual violence. (See generally *id.,* § 66281.8.) Senate Bill 493 does not apply here since the incident itself and USC's subsequent investigation of the incident occurred prior to Senate Bill 493's effective date. We nevertheless find it noteworthy that the statute does not require universities to conduct live hearings featuring cross-examination of the accuser and other witnesses. (Cf. *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 91 [the Administrative

Procedure Act (Gov. Code, § 11340 et seq.) was inapplicable but was nonetheless "helpful as indicating what the Legislature believes are the elements of a fair and carefully thought out system of procedure for use in administrative hearings"].)

Senate Bill 493 is intended "to account for the significant individual civil consequences faced by respondents alleged to have committed sexual violence as well as the significant harm to individual complainants and to education equity more generally if sexual violence goes unaddressed." (Stats. 2020, ch. 303, § 1, subd. (n).) As relevant here, it gives universities the discretion to decide whether "a hearing is necessary to determine whether any sexual violence more likely than not occurred." (Ed. Code, § 66281.8, subd. (b)(4)(A)(viii), added by Stats. 2020, ch. 303, § 3.) It also instructs universities to consider, "[i]n making this decision, . . . whether the parties elected to participate in the investigation and whether each party had the opportunity to suggest questions to be asked of the other party or witnesses, or both, during the investigation." (*Ibid*.) Thus, universities are left to determine for themselves whether to conduct a hearing, how to format it, and what rules govern it.

Senate Bill 493 expressly provides that universities need not comply with any of its provisions that conflict with federal law. (Ed. Code, § 66281.8, subd. (f).) Federal law in this area is still evolving. After the OCR rescinded its 2011 "Dear Colleague" letter in 2017, it began a rulemaking process culminating in Title IX regulations that went into effect on August 14, 2020, three years after Boermeester's expulsion from USC. Though the 2020 Title IX regulations are inapplicable here, it is worth observing that the Title IX regulations may be trending towards providing private universities with more

flexibility in determining whether to conduct a live hearing.  To explain, the 2020 Title IX regulations require universities receiving federal funds to "provide for a live hearing" that allows "each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility," which "must be conducted directly, orally, and in real time."  (34 C.F.R. § 106.45(b)(6)(i) (2023).)  In June 2022, however, the OCR proposed amendments to the 2020 regulations, which are not yet final.  The proposed amendments provide that universities may opt "to conduct live hearings with cross-examination or have the parties meet separately with the decisionmaker and answer questions submitted by the other party when a credibility assessment is necessary."  (87 Fed. Reg. 41390, 41397 (July 12, 2022).)  After reexamining its position and evaluating relevant case law, the OCR determined that "neither Title IX nor due process and fundamental fairness" (87 Fed. Reg., *supra*, at p.  41505) requires universities "to provide for a live hearing with advisor-conducted cross-examination in all cases" (*id.* at p. 41507).  The OCR further justified the proposed amendments by stating that growing evidence calls into question "whether adversarial cross-examination is the most effective tool for truth-seeking in the context of sex-based harassment complaints involving students at postsecondary institutions" and shows that "information-gathering approaches such as questions asked in individual meetings instead of during a live hearing (sometimes described as inquisitorial procedures) are more likely to produce the truth than adversarial methods like cross-examination."  (*Ibid.*)

As stated above, we find it significant that Senate Bill 493 (as well as the OCR's most recent proposed amendments to the Title IX regulations) give universities wide latitude in

determining the precise nature of their disciplinary proceedings. But we also observe that the state of the law in this area is in flux and is, therefore, subject to continued change and development. We further emphasize that, because neither Senate Bill 493 nor the current or proposed Title IX regulations apply to this matter, they are not dispositive.[6]

## D. Fair Procedure Does Not Require Live Hearings with Cross-examination

We must decide whether fair procedure requires private universities to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a live hearing with the accused student in attendance, either in person or virtually. Applying our fair procedure precedent discussed above, we hold that it does not. Requiring live hearings featuring real-time cross-examination of witnesses in the accused student's presence would be contrary to our prior conclusion that "fair procedure does not compel formal proceedings with all the embellishments of a court trial." (*Pinsker II*, *supra*, 12 Cal.3d at p. 555.) It would also be contrary

---

[6] Going forward, all universities that receive state financial assistance and are not exempt from Senate Bill 493 will need to comply with Senate Bill 493 in any context in which the statute applies. To the extent that our holding conflicts with any of the provisions of Senate Bill 493, Senate Bill 493's provisions control. (Ed. Code, § 66281.8, subd. (g)(2) ["Any case law that conflicts with the provisions of the act . . . shall be superseded as of this statute's effective date"]; see also *Woods v. Young* (1991) 53 Cal.3d 315, 324 ["[A] later, more specific statute controls over an earlier, general statute"].) The parties agree that Senate Bill 493 does not apply retroactively to this matter, and we accordingly do not opine on what the outcome of Boermeester's petition would have been had the statute applied to his claims.

to our admonition that courts must refrain from fixing rigid trial-like procedures "that must invariably be observed." (*Ibid*.)

As we have recognized, an accused student has a significant interest in completing a postsecondary education. For this reason, private universities must comply with the fair procedure doctrine by affording accused students reasonable notice of the charges and a meaningful opportunity to respond before disciplining them. When crafting the precise procedures necessary to provide a meaningful opportunity to respond, however, a private university must balance competing interests, including the accused student's interests in a fair procedure and completing a postsecondary education, the accuser's interest in not being retraumatized by the disciplinary process, and the private university's interests in maintaining a safe campus and encouraging victims to report instances of sexual misconduct or intimate partner violence without having to divert too many resources from its main purpose of education. (See *Ezekial*, *supra*, 20 Cal.3d at pp. 277–278 [weighing the plaintiff's economic interest in completing the residency program against the private hospital's interest in protecting itself from the mistakes of incompetent physicians]; accord, *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634 (*Westmont*) [observing that "[a] fair hearing strives to balance three competing interests" among the accused student, the accuser, and the university].) It is therefore appropriate to give private universities broad discretion in formulating their disciplinary processes to ensure that they not only provide the accused student a meaningful opportunity to be heard, but also embolden victims to report incidents of sexual misconduct or intimate partner violence, encourage witnesses to participate in the disciplinary process, and allow the private university to

conserve its resources so that it can remain focused on its primary mission of providing a postsecondary education.

The Court of Appeal majority reasoned that the accused student must be able to engage in adversarial back-and-forth questioning with the accuser and other witnesses at a live hearing in order to assess witness credibility and to "fully present his [or her] defense." (*Boermeester v. Carry*, *supra*, B290675.) While live adversarial questioning may be considered essential in the context of a criminal trial (*People v. Louis* (1986) 42 Cal.3d 969, 982–983), there is no absolute right to a live hearing with cross-examination in administrative proceedings, even where constitutional due process applies. As courts have explained in other administrative contexts, " '[d]ifferences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts." . . . The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.' " (*Murden v. County of Sacramento* (1984) 160 Cal.App.3d 302, 311.) The fair procedure doctrine similarly recognizes "the practical limitations on the ability of private institutions to provide for the full airing of disputed factual issues." (*Ezekial*, *supra*, 20 Cal.3d at p. 278.) Private universities are ill-equipped to function as courts because they lack subpoena power to force key witnesses to attend a hearing and be subject to cross-examination. They must instead rely on the voluntary participation of witnesses, which may prove more likely when the disciplinary process allows witnesses to testify outside of the context of a live hearing and outside the accused student's presence. As the Attorney General, appearing here as amicus

curiae, observes, requiring live hearings featuring real-time adversarial questioning "threatens to deter students from participating and to traumatize those who do." Furthermore, such hearings would require private universities to make on-the-fly rulings on objections to proposed questions and other issues raised during the hearing, which university staff may not be adequately trained to do. This would "divert both resources and attention from a university's main calling, that is education." (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078 (*Regents I*); accord, *Goss v. Lopez* (1975) 419 U.S. 565, 583 ["To impose . . . even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness"].) Simply put, the " 'procedures for dismissing college students [are] not analogous to criminal proceedings and could not be so without at the same time being both impractical and detrimental to the educational atmosphere and functions of a university.' " (*Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763, 770, quoting *Goldberg, supra*, 248 Cal.App.2d at p. 881.)

In this case, USC provided Boermeester notice of the allegations; the opportunity to provide his version of events in his interview with the Title IX investigator; the opportunity to independently review the testimonial and documentary evidence with his attorney-advisor; the opportunity to submit his own evidence and the names of potential witnesses to the Title IX investigator; the opportunity to respond to the testimonial and documentary evidence through an in-person evidence hearing held at the Title IX office and conducted by the Title IX coordinator (which he declined to attend in favor of submitting a written response to the evidence); the opportunity

to submit questions for the Title IX coordinator to ask Roe at her own evidence hearing (which he also declined to do); and the opportunity to appeal the misconduct sanctioning panel's decision to the appellate panel. USC was not required to have gone further by conducting a live hearing with Boermeester in attendance and with Boermeester directly or indirectly cross-examining the witnesses and asking follow-up questions, either in person or virtually.

Boermeester relies on recent appellate court decisions to support his view that fair procedure requires live hearings at which accused students are permitted to cross-examine witnesses (in person or virtually), but most of these cases do not help him. In *University I*, the first California appellate case to analyze what procedures might be required in this context, the court correctly observed that fair procedure requires only " 'notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections' " (*University I, supra,* 246 Cal.App.4th at p. 240) and concluded from this that "a full trial-like proceeding with the right of cross-examination is not necessary" (*id.* at p. 248). It is true that, subsequent to the *University I* decision*,* some courts have held that private universities must allow the accused student to indirectly cross-examine the accuser or third party witnesses where the adjudication "turns on witness credibility," but most of these decisions have not specified that the indirect cross-examination should occur within the context of a live hearing. (*Westmont, supra,* 34 Cal.App.5th at p. 638; accord, *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1070 (*Claremont McKenna*); *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1237 (*University II*); see also *Regents I, supra,* 5 Cal.App.5th at

p. 1084.) In *University II*, for example, the court directed the private university to give the accused student "an opportunity to submit a list of questions" for the university's adjudicators to ask the accuser if it proceeded with a new disciplinary proceeding upon remand (*University II*, at p. 1238), but it did not direct the university to conduct a hearing — even after acknowledging that the university's policies did not allow for a hearing (see *id.* at pp. 1235, 1238). Moreover, courts have been careful to observe that there exist several " 'alternate ways of providing accused students with the opportunity to hear the evidence being presented against them' " and to rebut such evidence, other than "permit[ting] [the accused student's] presence during the [witnesses'] testimony." (*Westmont*, at p. 638; accord, *University I*, at p. 245, fn. 12.)

Indeed, aside from the split opinion of the Court of Appeal below, *Doe v. Allee* (2019) 30 Cal.App.5th 1036 is the only decision to hold that a private university must allow an accused student to indirectly cross-examine witnesses "at a hearing at which the witnesses appear[] in person or by other means [e.g., videoconferencing]," even where the private university's policies do not provide a hearing. (*Id.* at p. 1071.) The *Allee* court acknowledged that fair procedure "requirements are 'flexible' and entail no 'rigid procedure' " (*id.* at p. 1062), yet it failed to explain how its holding comports with these principles. We accordingly disapprove of *Doe v. Allee, supra,* 30 Cal.App.5th 1036 to the extent it is inconsistent with our opinion.

At oral argument, Boermeester's counsel asserted that providing direct or indirect cross-examination of the accuser or other witnesses outside of a live hearing attended by the accused student is inadequate because the private university may "filter" or misrepresent witnesses' answers to the accused

student's questions.  Of course, if universities choose to question the accuser or other witnesses outside of the accused student's presence, they will need to conceive of a method by which to meaningfully convey the responses to the accused student, such as by providing the accused student with transcripts, video or audio recordings, or reasonably detailed summaries of the testimony. (See *Westmont*, *supra*, 34 Cal.App.5th at p. 638.) We leave these specific procedures up to the university to determine.  But we see no reason to address the theoretical risk that private universities may filter answers by, in response, categorically requiring them to conduct a live hearing with the accused student in attendance and at which the accused student is allowed to directly or indirectly cross-examine witnesses.

We note that this is not a case in which the accused student was given *no* hearing at all.  As described above, the parties agree that USC's policies provided separate and individual evidence hearings for both Boermeester and Roe, and that USC complied with its policies by offering the parties the opportunity to attend their separate evidence hearings. Although Boermeester could not have cross-examined Roe or the third party witnesses in real time at his hearing, he could have responded to the evidence and presented his defense before USC's adjudicators had he chosen to attend his hearing.  We do not opine on whether and under what circumstances a private university might properly choose to refrain from providing an accused student with a hearing that gives the accused student the opportunity to respond to the evidence before the university's adjudicators, since such a hearing was offered to the accused student in this case.

We also do not opine on whether and under what circumstances a private university might be *required* to allow

the accused student to indirectly cross-examine the accuser by submitting questions for the university's adjudicators to ask the accuser outside of the context of a live hearing or the accused student's presence, since USC afforded Boermeester the opportunity to submit questions for the Title IX coordinator to ask Roe at her separate evidence hearing. Similarly, we do not opine on whether USC's procedure was unfair because Boermeester was not allowed to submit questions for USC's adjudicators to ask the third party witnesses during the Title IX investigator's interviews with those witnesses, since Boermeester does not raise this claim.

Were we to assume, however, that a private university must provide an accused student the opportunity to indirectly cross-examine the accuser or third party witnesses outside of the context of a live hearing when the credibility of the accuser or third party witnesses is central to the adjudication, as some lower courts have held (see *Claremont McKenna*, *supra*, 25 Cal.App.5th at p. 1070; *University II*, *supra*, 29 Cal.App.5th at p. 1237; *Westmont*, *supra*, 34 Cal.App.5th at pp. 638–639; see also *Regents I*, *supra*, 5 Cal.App.5th at p. 1084), we would find USC's failure to provide Boermeester the opportunity to submit questions for the third party witnesses in this case to be harmless. In this case, the accounts of the third party witnesses merely corroborated Roe's initial accusation that Boermeester harmed her during the incident in question. Shortly after the incident occurred, Roe told the Title IX investigator that Boermeester had physically harmed her. Specifically, Roe said that it "hurt" when Boermeester grabbed the back of her hair "hard" and told her to drop her dog's leash; that it "hurt" when Boermeester grabbed the front of her throat and neck, causing her to cough; and that her "head hurt" after Boermeester

grabbed her by the neck again and pushed her head "hard," causing her head to hit the alleyway wall. The video of the incident — though grainy and soundless — is consistent with Roe's initial account. (*Boermeester v. Carry*, *supra*, B290675.) Boermeester himself admitted that he had his hands on Roe's neck and had her against the alleyway wall. In sum, even without considering the third party eyewitness testimony, USC could have concluded that Boermeester "caus[ed] physical harm" to Roe and, thus, violated its policy against intimate partner violence.

Boermeester maintained that the act was playful or sexual in nature and amounted to mere "roughhousing." USC determined, however, that Boermeester's intent was irrelevant. Carry — who made the final decision per USC's policy — found that since "[i]ntent to cause physical harm is not a required element" of USC's policy against intimate partner violence, Boermeester's alleged lack of intent to cause Roe physical harm was not a mitigating factor. She therefore concluded that, "[w]hether [Boermeester] intended to cause [Roe] harm or did so recklessly, expulsion [was] appropriate given the nature of the harm inflicted." Because intent was irrelevant under USC's policy against intimate partner violence, USC could have based its decision to expel Boermeester exclusively on Roe's initial statement, the video consistent with that statement, and Boermeester's own admissions — all of which tended to show that Boermeester caused Roe physical harm.

It is true that Roe later recanted her testimony and agreed with Boermeester that the incident was playful in nature. But even if Roe's recantation put her initial testimony in doubt, USC provided Boermeester the opportunity to indirectly cross-examine Roe and explore any inconsistencies in her story.

Boermeester thus had the opportunity to submit questions to be asked of the most important witness — the person he allegedly hurt. Moreover, USC, as the finder of fact, was entitled to determine that Roe's first statement was more credible than her later recantation. Finally, we must acknowledge, as we did in *People v. Brown* (2004) 33 Cal.4th 892, 899, that it is not uncommon for victims of intimate partner violence to recant. Roe's post-incident communications with USC's Title IX office and her friends indicate that she feared retaliation and felt a sense of loyalty towards Boermeester, either of which may have motivated her later recantation.

In conclusion, USC was not required to provide Boermeester the opportunity to directly or indirectly cross-examine Roe and other witnesses at a live hearing with Boermeester in attendance, whether in person or virtually.

### III. DISPOSITION

We reverse the judgment of the Court of Appeal and remand for it to determine in the first instance the remaining claims Boermeester raised on appeal that the Court of Appeal expressly declined to reach.


**GROBAN, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Boermeester v. Carry

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 49 Cal.App.5th 682
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S263180
**Date Filed:** July 31, 2023

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Amy D. Hogue

_____

**Counsel:**

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Cynthia P. Garrett for Families Advocating for Campus Equality as Amicus Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Beth J. Jay, Jeremy B. Rosen, Mark A. Kressel, Scott P. Dixler, Sarah E. Hamill; Young & Zinn, Julie Arias Young and Karen J. Pazzani for Defendants and Respondents.

Rob Bonta, Attorney General, Matthew Rodriquez, Chief Assistant Attorney General, Michael L. Newman, Assistant Attorney General, Sarah E. Belton and Alexis M. Piazza, Deputy Attorneys General, for the Attorney General of California as Amicus Curiae on behalf of Defendants and Respondents.

Gibson, Dunn & Crutcher, Theane Evangelis, Jeremy S. Smith, Andrew M. Kasabian; Amy Porter; and Brenda Adams for California

Women's Law Center, Equal Rights Advocates, Kylee O., Maryam I., Claudia R., Alliance for HOPE International, Atlanta Women for Equality, Child Abuse Forensic Institute, Center for Community Solutions, Community Legal Aid SoCal, Domestic Abuse Center, Family Violence Appellate Project, Family Violence Law Center, Feminist Majority Foundation, Law Foundation of Silicon Valley, Legal Aid at Work, Legal Voice, Los Angeles Center for Law and Justice, National Association of Women Lawyers, National Women's Law Center, Public Counsel, Rural Human Services/Harrington House, San Diego Volunteer Lawyer Program, Southwest Women's Law Center, Texas Association Against Sexual Assault, Walnut Avenue Family & Women's Center, WEAVE, Inc., and Women's Law Project as Amici Curiae on behalf of Defendants and Respondents.

O'Melveny & Myers, Apalla U. Chopra, Marni Barta, Allan W. Gustin and Anton Metlitsky for California Institute of Technology, Chapman University, Claremont McKenna College, Occidental College and Pepperdine University as Amici Curiae on behalf of Defendants and Respondents.

Arent Fox, Lowell C. Brown and Candace C. Sandoval for California Hospital Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark M. Hathaway
Hathaway Parker
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
(213) 529-9000

Jeremy B. Rosen
Horvitz & Levy LLP
505 Sansome Street, Suite 375
San Francisco, CA 94111-3175
(818) 995-5838